FILED
CLERK

4:09 pm, Feb 12, 2018

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
ELIZABETH WEBB,

                     Plaintiff,

           -against-

ZIMMER, INC., ZIMMER HOLDINGS, INC.,
and ZIMMER ORTHOPAEDIC SURGICAL
PRODUCTS, INC.,

                    Defendants.
---------------------------------------------------------X

**MEMORANDUM OF
DECISION & ORDER**
2:14-cv-01106 (ADS)(GRB)

**APPEARANCES:**

**Silverson Pareres & Lombardi LLP**
*Counsel for the Plaintiff*
192 Lexington Avenue, 17th Floor
New York, NY 10016
    By:   Joseph Pareres, Esq.,
           Nancy Maltin, Esq., Of Counsel

**McCarter & English LLP**
*Co-Counsel for the Defendants*
245 Park Avenue, 27th Floor
New York, NY 10167
    By:   Minji Kim, Esq.,
           Zane Riester, Esq., Of Counsel

**Faegre Baker Daniels LLP**
*Co-Counsel for the Defendants*
110 West Berry Street, Suite 2400
Fort Wayne, Indiana 46802
    By:   Peter Meyer, Esq.,
           Joseph Price, Esq., Of Counsel

1

**SPATT, District Judge**:

On February 20, 2014, plaintiff Elizabeth Webb (the "Plaintiff" or "Webb") initiated this product liability action against, Zimmer, Inc. ("Zimmer" or the "Defendant"), Zimmer Holdings, Inc., and Zimmer Orthopedic Surgical Products, Inc. (together, the "Defendants") in this Court. Presently before the Court is a motion for summary judgment filed by the Defendants on June 28, 2017, pursuant to Federal Rule of Civil Procedure ("FED. R. CIV. P." or "Rule") 56, and a motion by the Defendants to strike the affidavit of Douglas B. Unis, M.D. filed by the Defendants on September 7, 2017, pursuant to FED. R. CIV. P. 26.

For the reasons set forth herein, the Defendants' motion to strike is granted in part and the motion for summary judgment pursuant to Rule 56 is denied without prejudice.

## I. BACKGROUND

### A. THE FACTUAL BACKGROUND

#### 1. The Plaintiff & the First Surgery

The Plaintiff was born on May 10, 1955. During the relevant time period in this case, she was approximately 5'3" tall and weighed approximately 150 pounds with a body mass index of 28. Rule 56.1(b) Statement ("56.1 Statement") ¶ 3. On January 1, 2011, in response to pain in her right knee, she saw Dr. Norman Scott, an orthopedic surgeon. He ordered an MRI, which revealed arthritis in the right knee, medial and lateral meniscal tears, and noted an abnormal ACL with signs consistent with a torn ligament. *Id*.

In February 2011, Webb visited Dr. Douglas Unis for the first time. Dr. Unis is an orthopedic surgeon who was referred to Webb by Dr. Ramon Tallaj. X-rays "confirmed that she has a severely arthritic right knee with actually about a 15-degree varus deformity." *Id*. ¶ 4. On March 14, 2011, Dr. Unis performed a right total knee replacement on Webb using a Zimmer

2

Gender Solutions Natural-Knee Flex system (the "Product"). The Product included (1) a Zimmer Gender Solutions Natural-Knee Flex femoral component; (2) a Zimmer Gender Solutions Natural-Knee Flex Prolong Ultracongruent articular surface; (3) a Zimmer Gender Solutions Natural-Knee II Nonporous Tibial Baseplate; and (4) a NexGen All-Polyethylene Patellar component. *Id*. ¶ 5. At the time of her surgery, the Plaintiff was 55 years old.

Between 2011 and 2014, Dr. Unis performed between 150 and 200 knee replacements a year. Approximately 85 percent of those were primary total knee replacements. 56.1 Statement ¶ 73. At the time, Dr. Unis was using the Product for all of his primary knee replacements, regardless of the specifics of his patients' conditions. DE 63-4 at 44:18-22. He "was comfortable with the nuances of the system which [he believes] contributes to the success of putting in an implant." *Id*. at 44:22-25. In his opinion, "you are better off having the surgeon be comfortable with whatever system that he or she uses than having that surgeon use whatever is the latest, greatest thing being marketed." *Id*. at 45:6-10. Dr. Unis continued to use the Product in his primary knee replacements through 2014 and remained comfortable with the Product at that time. 56.1 Statement ¶ 74.

He testified that 20 percent of total knee replacements will require revision surgery within 20 years after they are implanted. *Id*. ¶ 78.

### 2. Post-Operative

Ten days after her surgery, Dr. Unis remarked that Webb "really looked great. She is using a cane. She has got full extension, flexion to 105 degrees even." 56.1 Statement ¶ 6. On April 18, 2011, the Plaintiff attended her first outpatient physical therapy appointment, where she described her pain as intermittent and worse with prolonged ambulation and weight-bearing. She also complained of "weakness of [her] quads." *Id*. ¶ 7.

On April 21, 2011, Dr. Unis observed that"[s]he looks absolutely beautiful. She has full extension, flexion to 120 degrees. No pain. No instability." *Id.* ¶ 8. That June, Dr. Unis reported again that "[s]he looks fantastic." *Id.* ¶ 9.

On August 18, 2012, Webb was seen at the emergency room of St. Luke's Hospital, where she was complaining of knee pain. She claims that she "[heard a] popping/cracking noise while walking yesterday" and was "unable to bear weight [on it]." There was no evidence in an x-ray of "interval hardware loosening or failure," but there was "interval development of a large suprapatellar joint effusion [and] mild associated posterior subluxation of the femur with respect to the tibial plateau." *Id.* ¶ 10. Later that day, Dr. Unis performed a revision surgery. During the surgery, Dr. Unis identified and removed "the anteriorly dislocated polyethylene spacer." He also found a "broken locking mechanism piece of polyethylene." Dr. Unis inserted another 16-mm thick Zimmer Gender Solutions Natural-Knee Flex Prolong Ultracongruent tibial articular surface, which was the same thickness as was originally implanted in Webb. *Id.* ¶ 11-12.

On November 8, 2012, Webb informed Dr. Unis during a post-operative visit that she "was basically back to normal until about 2 weeks ago when she started feeling some giving way of the knee and some particularly lateral and anterior knee pain." Dr. Unis also reported that her "stability is good" and that "she actually has firm endpoints at full extension as well as 20 degrees of flexion similar to what she had prior to the implant failure." *Id.* ¶ 14. X-rays reported that "there may be some posterior subluxation of the femoral head with respect to the tibial plateau." *Id.* ¶ 15.

On November 24, 2012, Webb again went to St. Luke's Hospital complaining of pain in her right knee. *Id.* ¶ 16. Two days later, Dr. Unis again performed revision surgery to replace the dislocated Natural-Knee Flex Prolong Ultracongruent tibial articular surface. However, there was no breakage or other deformities observed on either the Natural-Knee II Nonporous Tibial

4

Baseplate or the articular surface. *Id*. ¶ 17. This time, a thicker replacement part was used, one with a thickness of 19 mm. *Id*. ¶ 19. She was released from the hospital on November 27, 2012. *Id*. ¶ 18. On December 7, 2012, Webb reported to Dr. Unis during a visit that "the knee is feeling quite secured and [she] is very happy with her progress." *Id*. ¶ 21.

In October 2013, Webb visited two other orthopedic surgeons to obtain second and third opinions regarding her knee pain. She reported that "she is having knee pain and feels the same antecedent symptoms that she was having last time she dislocated." *Id*. ¶ 21-22. On October 25, 2013, Webb saw Dr. Unis claiming, "feelings of instability similar to what she felt prior to poly failure last year." Dr. Unis suggested that using a more constrained, "revision type knee" was the most prudent course of action, given her recurrent issues of instability. *Id*. ¶ 23.

On September 30, 2014, Webb again complained that she had "an exacerbation [in] feelings of instability in the right knee over the past 2 weeks." The Plaintiff and Dr. Unis determined that a more constrained total knee replacement device was appropriate for her. *Id*. ¶ 24.

On October 13, 2014, Dr. Uris performed a full revision surgery on Webb's right knee that replaced the Product with a constrained total knee replacement system. This system contained a Zimmer Legacy-Knee Constrained Condylar Knee femoral component, a NexGen Stemmed Tibial Component, and an articular surface. Dr. Unis observed no loosening, dislocation, or breakage of any of the Product's components. *Id*. ¶ 25. Webb was released from the hospital on October 15, 2014. *Id*. ¶ 26.

On March 19, 2015, Dr. Unis noted in a post-operative visit that Webb was "doing beautifully and feeling like her knee is stable." *Id*. ¶ 27.

### 3. Design and Labeling of the Product

When the Product was designed, Zimmer performed two series of tests to assess the durability of the articular surface locking mechanisms: (1) Anterior-Posterior Shear Fatigue Testing of the N-K Flex Prolong Articular Surface" to gauge the durability of the locking mechanism against anterior and posterior shear forces; and (2) Anterior Liftoff Testing of the N-K Flex Prolong Articular Surfaces to evaluate the resistance of the locking mechanism to anterior liftoff. *Id*. ¶ 39. In addition, Zimmer performed functional relationship layouts during the design process to confirm that the GS-NKF femoral components did not impinge on the posterior eminence of the articular surface at up to 15 degrees of hyperextension. *Id*. ¶ 47. When Zimmer modified the articular surface, it repeated the anterior liftoff testing of that component in the Product. *Id*. ¶ 46.

Webb's first two N-K Flex Articular Surfaces contained Packaged Inserts with a list of the indications, warnings, risks, contraindications, adverse effects, precautions, and patient counseling information for the Product. *Id*. ¶ 48. In the Package Inserts, under "Adverse Effects," the surgeon is warned of, in pertinent part: (1) "Loosening or fracture/damage of the prosthetic knee components or surrounding tissues;" (2) "Dislocation and/or joint instability;" and (3) "Pain." *Id*. ¶ 49. In the "Warnings" section, the surgeon is informed that "[s]oft [t]issues should be balanced and components positioning confirmed to minimize edge loading." *Id*. ¶ 50. Under "Patient Counseling Information," the insert states that "[b]ecause prosthetic joints are not as strong, reliable, or durable as natural, healthy joints, all prosthetic knees may need to be replaced at some point." *Id*. ¶ 51. The Surgical Technique Guide also warns that surgeons need to "[a]void excessive posterior slope especially if the posterior cruciate ligament is deficient." *Id*. ¶ 52.

**B. THE PROCEDURAL BACKGROUND**

On February 20, 2014, Webb filed this action against the Defendants, in this Court, alleging that the Product, in particular the Zimmer Gender Solutions Natural-Knee Flex Prolong Ultracongruent Articular Surface, is defective. *Id.* ¶ 1. At this stage of the litigation, Webb has abandoned design defect claims and has confined her claims to those based on a failure-to-warn theory. *Id.* ¶ 2.

On November 30, 2016, fact and expert discovery was completed in this matter. *See* DE 40.

On January 17, 2017, the Defendants filed a motion to exclude the testimony of one of the Plaintiff's experts, Mari Truman. *See,* DE 44. In the Plaintiff's opposition papers, Webb included an Affidavit from Dr. Douglas Unis, dated February 17, 2017. *See* DE 49-7. On February 27, 2017, the Defendants filed a motion to strike the affidavit of Dr. Unis. *See* DE 52.

This Court held a pre-motion conference on March 29, 2017 for the instant motion for summary judgment and denied the Defendants' motion to exclude Ms. Truman's expert testimony. *See* DE 57-58. The Court further noted that the Defendants' motion to strike Dr. Unis's affidavit was denied as moot. *Id.*

On June 28, 2017, the Defendants filed the instant motion for summary judgment pursuant to Rule 56. *See* DE 64. In the Plaintiff's opposition papers, which were filed on August 22, 2017, Webb once again included Dr. Unis's affidavit. *See* DE 78-4. This prompted the Defendants to reintroduce the instant motion to strike Dr. Unis's affidavit, which was filed on September 7, 2017. *See* DE 80. Both motions were fully briefed on September 20, 2017.

## II. THE MOTION TO STRIKE

### A. STANDARD OF REVIEW

The Defendants seek to exclude the affidavit of Dr. Douglas Unis on the grounds that the Plaintiff did not disclose Dr. Unis as an expert witness and because the Plaintiff has not provided the required disclosures under Rule 26(a). The Defendants further allege that Dr. Unis's Affidavit is a "sham affidavit."

Pursuant to Rule 26, "a party must disclose to the other parties the identity of any witnesses it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." FED. R. CIV. P. 26(a)(2)(A). In the case of expert witnesses, experts must submit a written report that includes "a complete statement of all opinions the witness will express and the basis and reasons for them [and] the facts or data considered by the witness in forming them." FED R. CIV. P. 26(a)(2)(B).

Prior to 2010, when Rule 26(a)(2)(C) was added, as a general rule, treating physicians did not need to serve expert reports or be formally designated as experts in order to testify. *Barack v. Am. Honda Motor Co.*, 293 F.R.D. 106, 108 (D. Conn. 2013); *Reilly v. Revlon, Inc.*, No. 08-cv-205, 2009 WL 2900252, at *3 (S.D.N.Y. Sept. 9, 2009); *Monroe-Trice v. Unum Emp. Short-Term Disability Plan*, No. 00-cv-6238, 2003 WL 68033, at *1 (S.D.N.Y. Jan. 8, 2003) ("Rule 26(a)(2)(B) does not require a treating physician to provide a report as a predicate to testifying for his patient.").

However, in such circumstances, the treating physician was more properly considered a fact witness and confined to testifying only to those "opinions formed in providing plaintiff medical care, [as] such opinions are considered an explanation of treatment notes." *Turner v. Delta Air Lines, Inc.*, No. 06-cv-1010, 2008 WL 222559, at *1 (E.D.N.Y. Jan. 25, 2008); *accord*

*Cruz v. Henry Modell & Co.*, No. 05-cv-1450, 2008 WL 905356, at *12-14 (E.D.N.Y. Mar. 31, 2008) ("It is well settled that 'treating physicians can be deposed or called to testify at trial without the requirement of a written report.'" (internal citations omitted)); *Lamere v. New York State Office for the Aging*, 223 F.R.D. 85, 89 (N.D.N.Y. 2004) ("It is indeed certain that a treating physician who has not complied with the reporting requirements of Rule 26(a)(2)(B), should not be permitted to render opinions outside the course of treatment and beyond the reasonable reading of the medical records."), *aff'd*, No. 03-cv-0356, 2004 WL 1592669 (N.D.N.Y. July 14, 2004); *Peck v. Hudson City Sch. Dist.*, 100 F. Supp. 2d 118, 121 (N.D.N.Y. 2000) ("[T]o the extent that a treating physician testifies only to the care and treatment of the patient, the physician is not considered to be a 'specially employed' expert and is not subject to the written report requirements of Rule 26(a)(2)(B).").

Any information or opinion that was acquired by the treating physician from an outside source was improper. *See Mangla v. Univ. of Rochester*, 168 F.R.D. 137, 139 (W.D.N.Y. 1996); *see also Smolowitz v. Sherwin–Williams Co.*, No. 02-cv-5940, 2008 WL 4862981, at *4 (E.D.N.Y. Nov. 10 2008) (confining a treating physician's testimony to "information that he has acquired in his role as a treating physician").

After the adoption of Rule 26(a)(2)(C) in 2010, a treating physician may offer factual testimony as well as opinion testimony regarding his patient's diagnosis, treatment, prognosis, or causation as long as the proper disclosure under Rule 26(a)(2)(C) is served on the defendant. *See Geary v. Fancy*, No. 12-cv-796, 2016 WL 1252768, at *2 (W.D.N.Y. Mar. 31, 2016). A treating physician's testimony may even be based on information learned from outside sources "provided the basis for the testimony is within Rule 26(a)(2)(C)'s required summary report, and such disclosure complies with Rule 26(a)(2)(C)." *Id.* at *3. Rule 26(a)(2)(C) requires a statement

9

regarding "(i) the subject matter on which the witness is expected to present evidence under [FRE] 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." FED. R. CIV. P. 26(a)(2)(C). This is in contrast to the more extensive expert report and disclosures required under Rule 26(a)(2)(B).

Without the required disclosure under either Rule 26(a)(2)(B) or Rule 26(a)(2)(C), a treating physician may only testify as a fact witness regarding patient treatment. This is because, "[treating physicians are] not specially hired to provide expert testimony; rather, they are hired to treat the patient and may testify to and opine on what they saw and did without the necessity of the proponent of the testimony furnishing a written expert report." *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 819 (9th Cir. 2011).

## B. ANALYSIS

The Defendants allege that Dr. Unis's Affidavit is untimely as his potential testimony exceeds the bounds of what a treating physician may properly testify to, and the Plaintiff failed to disclose him as an expert by the applicable deadline. Although Plaintiff's Expert Disclosures, dated August 13, 2015 listed Dr. Unis as an expert witness, *see* DE 81-2, the Plaintiff did not provide a summary of his expert opinions, as required by Rule 26(a)(2)(C). *See* FED. R. CIV. P. 26(a)(2)(C)(ii) (requiring that witnesses who are not required to provide a written report disclose "a summary of the facts and opinions to which the witness is expected to testify"). In relevant part, the Plaintiff disclosed that:

> In the course of his testimony, Dr. Unis will be asked to render expert opinion testimony regarding the care and treatment of the plaintiff, the four surgeries Dr. Unis performed on the plaintiff, his expert opinion as to the cause of the necessity for the revision surgeries he performed on the plaintiff after the primary implant failure, the manner in which the surgeries were performed, the results and findings of diagnostic tests taken as part of his care and treatment of the plaintiff, diagnosis, causation, pain and suffering and disability as a result of the multiple surgeries that

10

were required following the failure of the implant components at issue as well as any other questions that relate to the issue of plaintiff's damages.

DE 81-2 at 4. In other words, the Plaintiff revealed that Dr. Unis's testimony would be confined to his care and treatment of Webb, as well as "causation" and "any other questions that relate to the issue of plaintiff's damages."

Following the initial disclosures, the Plaintiff withdrew her initial expert reports for revision, based on her revised theory of the case. This prompted an email exchange between the Plaintiff's counsel and the Defendants' counsel. In pertinent part, the Defendants' counsel wrote on December 22, 2016:

> We have assumed that [Dr. Unis] will express no opinions outside of the facts related to [the Plaintiff's] treatment, as no such expert opinions have been disclosed. As you know, at the time of [Dr. Unis's] deposition, Plaintiff's theory, as articulated [i]n the expert report of Dr. Ngai and Ms. Truman, was not based on the failure-to-warn allegations now being presented. And such opinions from Dr. Unis were not disclosed in your August 13, 2015 disclosure, which I noted in a recent email was vague. Therefore, we assume that Dr. Unis will not offer opinions related to the adequacy of Zimmer's warnings or that a failure-to-warn caused Ms. Webb's failure.

DE 81-3 at 1. The Plaintiff's counsel responded that same day:

> I am not sure we disagree.
>
> Dr. Unis is a fact witness who you subpoenaed to testify at a deposition. His testimony will be in line with what he was asked at his deposition, and I expect that he will testify as to the nature of his surgeries and his expectations as the surgeon who operated on Ms. Webb. *His opinions will not be as an expert but as a fact witness to what he observed and concluded about the product and the plaintiff's physical condition based on his personal experiences in this case.*
>
> Our expert witness will be Mari Truman. I do not expect any overlap in the scope of what they will testify to at trial.

*Id.* (emphasis added). This exchange occurred in December 2016, subsequent to the expiration of fact and expert discovery, which terminated on November 30, 2016. There was no other effort by

11

the Plaintiff's counsel that could be construed by the Court as intended to serve as either an expert report or summary under Rule 26(a)(2).

The above-mentioned disclosures cannot be taken to satisfy the Rule 26(a)(2)(B) or Rule 26(a)(2)(C) requirements. First, although the Plaintiff listed Dr. Unis as an "expert" in his expert disclosure, *see* DE 81-2, the summary limits the testimony to largely care and treatment of the Plaintiff, although he included "causation" and "the issue of the plaintiff's damages.". However, there is no indication that Dr. Unis intended to testify as to Webb's failure to warn theory, or that he would utilize outside information to form his expert opinions. As mentioned above, Rule 26(a)(2)(C) requires "a summary of the facts and opinions to which the witness is expected to testify." FED. R. CIV. P. 26(a)(2)(C). The Plaintiff's current disclosure, as it pertains to Dr. Unis, does not satisfy Rule 26(a)(2)(C) as there has been no summary of testimony which exceeds the bounds of an ordinary fact witness, except, of course, that related to causation and damages. Without a summary of expert opinions which exceed the bounds of what a treating physician may testify to as an expert without the requisite disclosures, this disclosure does not constitute a summary of Dr. Unis's expert testimony. *See, e.g.*, *Ziegenfus v. John Veriha Trucking*, No. 10-cv-5946, 2012 WL 1075841, at *7 (S.D.N.Y. Mar. 28, 2012).

However, Webb did timely disclose Dr. Unis as a non-expert, treating physician in this matter. *See* DE 81-2. As such, Dr. Unis is permitted to testify as a fact witness to the facts acquired and opinions formed during his extensive medical and surgical treatment of Webb. *Motta v. First Unum Life Ins. Co.*, No. 09-cv-3674, 2011 WL 4374544, at *3 (E.D.N.Y. Sept. 19, 2011) ("The doctor will, however, be permitted to testify about his evaluation and treatment of plaintiff, and may express his opinions about the plaintiff's condition and prognosis based upon his observations while treating plaintiff." (internal citations omitted)); *De Rienzo v. Metropolitan Transit Auth. and*

*Metro-North R.R.*, No. 01-cv-8138, 2004 WL 67479, at *2 (S.D.N.Y. Jan. 15, 2004); *Palmieri v. Celebrity Cruise Lines, Inc.*, No. 98-cv-2037, 2000 WL 310341, at *5 (S.D.N.Y. Mar. 27, 2000) (collecting cases). "[T]he key to what a treating physician can testify to without being declared an expert is based on *his/her* personal knowledge from consultation, examination and treatment of the Plaintiff, 'not from information acquired from other sources.'" *Spencer v. Int'l Shoppes, Inc.*, No. 06-cv-2637, 2011 WL 4383046, at *3 (E.D.N.Y. Sept. 20, 2011) (citing *Mangla*, 168 F.R.D. at 139) (emphasis in original).

To the extent Dr. Unis's Affidavit explains his thoughts regarding the adequacy of Zimmer's warnings or what he would have done differently had he known about any alleged improper warning or contraindication—specifically paragraphs seven, and eight through twelve— these statements constitute an expert opinion. These paragraphs do not contain treatment explanations or opinions as to the Plaintiff's diagnoses; these are statements of hypothetical thoughts or actions that involve outside information.

Webb's failure to comply with Rule 26(a)(2)(C) does not automatically preclude the affidavit under Rule 37(c). "A district court has wide discretion to impose sanctions, including severe sanctions, under [Rule 37]," for any violation by a treating physician. *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 294 (2d Cir. 2006). Under Rule 37(c)(1), a party that fails to comply with Rule 26(a)'s obligations may not:

> use that information … to supply evidence on a motion at a hearing, or at trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard: (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure; (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

FED. R. CIV. P. 37(c)(1). This is to "prevent the practice of 'sandbagging' an opposing party with new evidence." *DeLuca v. Bank of Tokyo–Mitsubishi UFJ, Ltd.*, No. 06-cv-5474, 2008 WL 857492, at *12 (S.D.N.Y. Mar. 31, 2008) (citing *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004)); *see also Lamarca v. United States*, 31 F. Supp. 2d 110, 122 (E.D.N.Y. 1998) ("[The] duty to disclose information concerning expert testimony is intended to allow opposing parties to have a reasonable opportunity [to] prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." (internal citations and quotation marks omitted)).

However, at a minimum, it is appropriate, under Rule 37, to require a party that has not complied with its discovery obligations to pay the reasonable fees and costs incurred by the moving party in seeking both disclosure and discovery sanctions. *Gateway, Inc. v. ACS Commercial Sols., Inc.*, No. 07-cv-6732, 2009 WL 10695887, at *8 (S.D.N.Y. Sept. 18, 2009).

To decide what sanctions to issue, a court may consider:

(1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.

*Softel, Inc. v. Dragon Med. & Sci. Communs.*, 118 F.3d 955, 961 (2d Cir. 1997).

First, the Plaintiff has offered no persuasive explanation for not appropriately disclosing Dr. Unis's expert testimony, which is beyond what is properly given by a treating physician. *See Silivanch*, 171 F. Supp. 2d at 246 (preventing the admission of expert testimony that was not disclosed prior to discovery deadline). An attempt by the Plaintiff to characterize opinions which required information outside the patient's medical records as facts rather than opinions is unconvincing. The Court rejects Webb's arguments that the Unis Affidavit does not exceed the

14

scope of what is proper for a treating physician fact witness. *See Prendergast v. Hobart Corp.*, No. 04-cv-5134, 2010 WL 3199699 (E.D.N.Y. Aug. 12, 2010).

Second, the Unis Affidavit is viewed as instrumental to the Plaintiff's case because it is heavily cited in her summary judgment papers.

Third, the Defendants would be prejudiced if the Court were to allow portions of the Unis Affidavit to be admitted without allowing the Defendants to conduct additional discovery. The Defendants have not had the opportunity to review these opinions during discovery, which has been closed since November 2016.

Fourth, although fact and expert discovery in this case are closed and there is a summary judgment motion pending before the Court, district courts in this circuit have allowed the reopening of discovery for limited purposes. *See, e.g.*, *Fanning v. Target Corp.*, No. 05-cv-12, 2006 WL 298811, at \*3 (S.D.N.Y. Feb. 6, 2006) (permitting the depositions of two experts after the close of discovery to prevent prejudice when the experts were not timely designated as expert witnesses).

As such, the Rule 37 factors favor reopening discovery *only* to allow the Defendants to re-depose Dr. Unis on the failure to warn theory and his affidavit. *See, e.g.*, *Fanning*, 2006 WL 298811, at \*3.

Further, the Plaintiff's counsel must be held accountable to their affirmative statements that Dr. Unis only intended to testify as a fact witness based on his personal experiences and did not intend to overlap with Ms. Truman's testimony. By sending this email, Webb's counsel effectively conceded that Dr. Unis may not testify as an expert under Rule 26. *See* DE 81-3 at 1 ("His opinions will be not as an expert but as a fact witness"). Plaintiff's counsel's submission of an affidavit that exceeds that which is allowed by a treating physician in violation of Rule

15

26(a)(2)(C) and *his own affirmative statement* after the close of discovery caused this avoidable situation.

Therefore, the Court further orders that Plaintiff's counsel, Silverson Pareres & Lombardi, pay the Defendants' reasonable attorney's fees associated with the renewed deposition of Dr. Unis. Finally, the Court orders that Plaintiff's counsel pay the Defendants' reasonable attorney's fees that the Defendants' incurred in bringing this motion to strike. *See, e.g.*, *Gateway*, 2009 WL 10695887, at *14 (collecting cases).

### III. CONCLUSION

For the reasons set forth above, the Defendants' motion to strike is granted to the following extent: (1) the Defendants are permitted to re-depose Dr. Unis; (2) Silverson Pareres & Lombardi is ordered to pay the Defendants' attorney's fees associated with the renewed deposition of Dr. Unis; and (3) Silverson Pareres & Lombardi is further ordered to pay the Defendants' reasonable attorney's fees that the Defendants' incurred in bringing this motion to strike.

The Defendants' motion for summary judgment pursuant to Rule 56 dismissing all of the Plaintiff's claims is denied without prejudice and may be renewed at the close of the additional discovery period in conformance with this Court's Individual Rules.

Discovery is re-opened for the sole purpose of re-deposing Dr. Unis. The Court respectfully refers this matter to United States Magistrate Judge Gary R. Brown to set an expedited discovery schedule.

It is **SO ORDERED**:

Dated: Central Islip, New York

February 12, 2018

                                                                                                      /s/ Arthur D. Spatt

                                                                                                      ARTHUR D. SPATT

                                                                                                      United States District Judge